**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **ROBIN BILES,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:09-CV-318-B (BF)** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

The District Court referred this case to the United States Magistrate Judge for findings, conclusions, and recommendation, pursuant to 28 U. S. C. § 636(b).  This is an appeal from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying the claim of Robin Biles ("Plaintiff") for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act").  The Court has considered Plaintiff's Brief, filed July 31, 2009 and Defendant's Brief,  filed September 15, 2009. The Court has reviewed the parties' evidence in connection with the pleadings and hereby recommends that the District Court reverse the Commissioner's decision and remand the case for further proceedings.

## I. BACKGROUND[1]

### A.    *Procedural History*

Plaintiff filed an application for DIB on June 17, 2005, alleging disability since September 15, 2002. (Tr. 203.)  The Commissioner denied her claims initially on September 14, 2005 and again

---

[1] The following history comes from the transcript of the administrative proceedings, which is designated as "Tr."

1

upon reconsideration on March 23, 2006. (Tr. 185; 191.) Plaintiff timely requested a hearing. (Tr. 20.)

Administrative Law Judge ("ALJ") Robert A. Fitz conducted the *de novo* administrative hearing in Dallas, Texas on June 14, 2007. (Tr. 20.) Plaintiff appeared at the hearing with a representative and testified. (Tr. 20.) Karyl Kuuttila appeared and testified as a vocational expert ("VE"). (Tr. 20.) After the hearing, the ALJ received additional evidence from the VE and from a medical expert ("ME") in the form of interrogatories. (Tr. 88;101.)

On January 24, 2008, the ALJ issued his Notice of Decision finding Plaintiff "not disabled." (Tr. 17-30.) Plaintiff requested Appeals Council review of the ALJ's decision. (Tr. 15.) Nevertheless, the Appeals Council ultimately denied the claimant's request for review by its Notice dated November 14, 2008. (Tr. 7-9.) Plaintiff requested and was granted an extension of time to file a civil action. (Tr. 4.)

Plaintiff filed this case on February 18, 2009, seeking judicial review of the administrative proceedings pursuant to 42 U.S.C. §405(g). (Doc. 1.) This matter now is ripe for consideration on the merits.

### B.    *Factual History*

1.    Plaintiff's Age, Education, and Work Experience

Plaintiff's date of birth is September 23, 1954. (Tr. 202.) Plaintiff has a high school education and an associates degree. (Tr. 65-66.) Plaintiff's past work includes work as a mechanical designer (1986-2002). (Tr. 35-36.) Plaintiff has not worked since September 2002. (Tr. 35.)

2.    Plaintiff's Medical Evidence

In her disability report, signed July 14, 2005, Plaintiff listed her disabling conditions as "2 back surgeries, consistent swelling, arthritis, discs deterioration, degenerative disease, back and leg pain, scar tissue, [and] leg weakness." (Tr. 212.) Plaintiff's alleged disability onset date is September 15, 2002. (Tr. 21.) Plaintiff was insured for DIB through December 31, 2006. (Tr. 21.)

In 1985, Plaintiff had an anterior lumbar interbody fusion to replace a ruptured disc in her lower back. (Tr. 38; 388.) In 1989, Plaintiff reinjured her back when she fell at work. (Tr. 372.) In 1991, Plaintiff again had surgery on her lower back to repair a non-union of the fusion performed in the first surgery. (Tr. 389.) On March 13, 2002, Plaintiff returned to see Robert James Hilliard, M.D. and reported pain in her lower back that had been slowly getting worse over the past two years. (Tr. 394.) She also reported weakness in her legs from time to time but said she had no radiation of pain into her lower extremities. (Tr. 394.) After noting decreased forward flexion, tenderness bilaterally, and no signs of lumbar radiculopathy in either leg, Dr. Hilliard recommended Plaintiff see a therapist. (Tr. 394.)

On August 28, 2003, Plaintiff saw Marie Gaydos, M.D. for her lower back pain. Plaintiff told Dr. Gaydos that despite seeing Dr. Hilliard, discussing chronic pain therapies and having epidural steroid injections, she was still in pain. (Tr. 276.) She reported that she was taking several Vicodin per day and that sleeping was very uncomfortable. (Tr. 276.) Dr. Gaydos noted that Plaintiff had poor back posture and some tenderness along the lumbosacral area. (Tr. 276.) Dr. Gaydos' assessment was (1) chronic low back pain after two surgeries; (2) tobacco use; and (3) chronic pain. (Tr. 276.) She ordered an MRI of the lumbosacral spine and a dexa scan. (Tr. 276.)

Dr. Gaydos referred Plaintiff to Andrea L. Halliday, M.D. for a neurological evaluation. (Tr. 361.) Plaintiff first saw Dr. Halliday on December 4, 2003. (Tr. 361.) She reported mid-line low

back pain, leg aches bilaterally, and weakness in her lower extremities. (Tr. 361.) Plaintiff rated her pain as a six or seven on a scale of zero to ten. (Tr. 361.) Dr. Halliday noted that Plaintiff used a cane to ambulate. (Tr. 361.) She also noted that straight leg raise was negative bilaterally, there was no diminished range of motion of the back or demonstrable weakness in the lower extremities, and lower extremity sensation was grossly intact. (Tr. 362.) Plaintiff had a tingling sensation in her legs. (Tr. 362.). Dr. Halliday ordered a CT scan of the lumbar spine and a bone scan. (Tr. 362.)

Plaintiff returned to Dr. Halliday's office on December 22, 2003 after having a bone scan, plain films, and a CT scan. (Tr. 360.) The tests confirmed that Plaintiff is solidly fused from L4 to S1 and that she has some mild degenerative changes at L3-4. (Tr. 360.) Dr. Halliday then recommended a discogram of L2-3 and L3-4. (Tr. 360.) The discogram showed that Plaintiff is fused solidly from L4 to S1. (Tr. 359.) Dr. Halliday recommended a dorsal column stimulator and referred Plaintiff to Vinay Dalal, M.D. (Tr. 359.)

Plaintiff initially visited Dr. Dalal on May 5, 2004. (Tr. 565.) Plaintiff reported that her pain sometimes radiates to her shin and occasionally to her left leg. (Tr. 565.) Dr. Dalal noted that (1) there were no sensory or motor deficits; (2) deep tendon reflexes were +2; (3) there were bilateral leg spasms and numbness; (4) there was no clubbing, edema or cyanosis of the extremities; (5) straight leg raise was negative and gait was antalgic; (6) Plaintiff was able to walk on heels and toes; and (7) Plaintiff had decreased range of motion.(Tr. 566.) His diagnosis was (1) low back pain; (2) post laminectomy syndrome; (3) lumbar facet disease; and (4) SI joint dysfunction. (Tr. 566.)

On May 25, 2004, Dr. Dalal performed median branch facet blocks bilaterally at L4-5 and L5-S1. (Tr. 307.) On June 28, 2004, Dr. Dalal performed a bilateral SI joint injection. (Tr. 305.) On July 19, 2004, Dr. Dalal performed median branch facet blocks at right L4-S1. (Tr. 303.) On August

2, 2004, Dr. Dalal performed median branch facet blocks at left L4-S1. (Tr. 301.) On October 25, 2004, Dr. Dalal performed a trigger point injection. (Tr. 300.) On January 12, 2005, Dr. Dalal performed another trigger point injection. (Tr. 299.)

On January 28, 2005, Plaintiff returned to Dr. Gaydos due to cough, congestion and fever. (Tr. 267.) Dr. Gaydos' assessment was early pneumonia/bronchitis, tobacco abuse, and abnormal EKG. (Tr. 267.)

A state agency medical consultant independently reviewed Plaintiff's medical evidence on September 14, 2005. (Tr. 257.) He gave Plaintiff a primary diagnosis of post laminectomy syndrome and a secondary diagnosis of chronic back pain. (Tr. 257.) He found that Plaintiff can lift and/or carry twenty pounds occasionally and ten pounds frequently, that she can stand and/or walk (with normal breaks) for a total of six hours in an eight-hour workday, that she can sit, with normal breaks, for a total of about six hours in an eight-hour workday, that she can never climb ladders, ropes or scaffolds, that she can occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl. (Tr. 258-59.) The consultant found no manipulative, visual, communicative, or environmental limitations. (Tr. 260-61.) A second medical consultant independently reviewed Plaintiff's medical evidence on March 21, 2006 and affirmed the September 14, 2005 assessment in its entirety. (Tr. 256.)

On April 7, 2006, James T. McLaughlin, Ph.D. performed a psychiatric evaluation to determine Plaintiff's suitability to pursue a spinal cord stimulator trial. (Tr. 536.) Dr. McLaughlin noted that the claimant appeared to be fully oriented, that her speech was normal in melody and rate but rather low in volume and showed normal grammar and logical thought, that her memory appeared to be intact in all spheres, that her attention was good, that she appeared to have average

intellect, that affect was somewhat blunted but not seriously so, that her mood was calm but sometimes slightly anxious, that she was cooperative, and that there was no evidence of thought disturbance or substance abuse. (Tr. 536.) Plaintiff rated her pain as a five to six on a scale of zero to ten. (Tr. 536.) She said her pain ranged from one to eight or nine over the past two weeks. (Tr. 536.) She reported her current activity level to be half what it would be if she were pain free. (Tr. 536.) She said she can stand in one spot from fifteen to twenty minutes without movement and for up to one hour with movement, do a few hours of part time work in a family business, do most of the housework but cannot mop or bend over, do household activities if she paces herself, lift a gallon of milk sometimes, and take care of her personal hygiene without assistance. (Tr. 537.) She denied abusing her pain medications and noted that her muscle relaxants sometimes make her feel high. (Tr. 538.) Dr. McLaughlin noted that, overall, Plaintiff's psychological distress was average compared to other persons with chronic pain and long term medical rehabilitation. (Tr. 540.) Plaintiff's Axis I diagnosis was adjustment disorder with anxiety. (Tr. 540.) The Axis V diagnosis of Dr. McLaughlin was a current Global Assessment of Functioning ("GAF") from 65 to 70.[2] (Tr. 540.) He recommended that surgery for the spinal cord stimulator proceed.(Tr. 540.)

On June 13, 2006, Plaintiff underwent a procedure to place a dual 8 contact spinal cord stimulator for trial. (Tr. 531.) On July 10, 2006, Plaintiff underwent another procedure for a permanent dual lead spinal cord stimulator. (Tr. 518.)

Plaintiff's medical records show that during the relevant period, Plaintiff was diagnosed with depression. (Tr. 277; 298; 310.) She took Zoloft and Valium on a regular basis. (Tr. 266-78; 437-

---

[2]A GAF of 61 to 70 means the individual has some mild symptoms or some difficulty in social, occupational, or school functioning but generally is functioning pretty well. *Diagnostic and Statistical Manual of Mental Disorder DSM-IV (DSM)* 34 (4th ed., text revision 2000).

50.)

### 3.    Plaintiff's Hearing

Plaintiff was represented by counsel at the June 14, 2007 hearing. (Tr. 33.) After the ALJ had admitted the exhibits into the record, Plaintiff's attorney examined Plaintiff.  (Tr. 35.)  The first set of questions involved Plaintiff's work history. (Tr. 35-37.)  Plaintiff revealed she had worked at Bell Helicopter from 1986 until 2002 as a mechanical design engineer. She also stated that during that same period of time, she briefly worked at Baer America as a mechanical design engineer. (Tr. 36.) She primarily did drafting and design using a computer and drawing board at both jobs. (Tr. 36-37.)

The second set of questions dealt with Plaintiff's physical impairments. (Tr. 37-43.) Plaintiff testified that she has had two surgeries on her back. (Tr. 38.). The first surgery was in 1985 for disc replacement, and the second was in 1992 or 1993 after she fell and broke the same backbone. (Tr. 38.) The first surgery helped her back pain, but she started to go downhill after the second.  (Tr. 39.) She has pain in her lower back, starting from her tail bone up to the L2-3 lumbar areas. (Tr. 39-40.) The pain goes across her lower back, into her hips and sacroiliac area on both sides, and radiates to her legs. (Tr. 40.) She also has problems with muscle spasms in the legs and lower back. (Tr. 40.) Her back aches most of the time, it is sore to the touch, and sometimes she has very sharp pain. (Tr. 40.) To cope with the pain, she has received a series of shots and steroid injections and has also burned the nerves in her lower back. (Tr. 39.)

Plaintiff testified that she takes Advil for inflammation and hydrocodone for the pain, which makes the pain bearable. (Tr. 41-42.) She also takes muscle relaxants and uses a spinal cord stimulator to help with her muscle spasms. (Tr. 41.)  The muscle relaxants make her sleepy and the hydrocodone affects her concentration. (Tr. 42.)

The third set of questions involved how Plaintiff's pain has affected her daily activities. (Tr. 43-53). Plaintiff testified that she can sit for fifteen minutes to an hour at one time. (Tr. 43.) After sitting for a period of time, she has to get up and stretch, move around, or lie down. (Tr. 43-44.) She has to lie down an average of three times a day for fifteen to thirty minutes. (Tr. 44.) She can lift up to a gallon of milk. (Tr. 45.)

Plaintiff testified that after her second surgery, she had to use an ergonomic chair at work. (Tr. 46.) She was not able to work an eight-hour day due to pain and an inability to concentrate. (Tr. 46.) Her employer was accommodating and allowed her to decrease her hours by working on part time projects with flexible deadlines. (Tr. 46-47.) During her last year of work, she worked twelve to sixteen hours per week; however, she was still having problems. (Tr. 47-49.) She had to leave her job after the budget was cut and there were no part time projects for her to work on. (Tr. 51-52.)

Plaintiff testified that she can only walk 100 to 150 feet before needing to stop. (Tr. 49.) She uses a cane to ambulate and needs a scooter to grocery shop. (Tr. 50-54.) When working, she used the scooter when making trips to the factory. (Tr. 49-50.) Her legs ache and throb sometimes, she has weakness in her legs, and she has to keep her legs elevated. (Tr. 52-54.) She testified that she used a TENS unit at one point, but it did not help her pain. (Tr. 54.) She is able to cook simple meals a couple times a week, and she can wash dishes for a short period of time. (Tr. 52-54.) She has trouble sleeping due to pain, needs to take naps throughout the day, and can reach overhead but should not do so very often. (Tr. 54-55.)

The final set of questions dealt with Plaintiff's depression.. (Tr. 56-59.) Plaintiff testified that, after her second surgery, she became depressed because she had to decrease her level of activity dramatically. (Tr. 56.) She takes Zoloft and Wellbutrin for the depression, and it seems to be

helping. (Tr. 56-57.) She testified she has gained 20-25 pounds. (Tr. 57.) She has a high energy level all the time, does crafts with her grand children, and paints. (Tr. 57-58.) She is no longer able to garden or fish. (Tr. 58.) Her pain pills affect her concentration. (Tr. 58.) She says she reads the paper, works puzzles, and is involved with her church a little. (Tr. 59.) She cannot vacuum but is able to wipe the kitchen counters while sitting on a stool in the kitchen. (Tr. 59-60.) She also takes medicine for high blood pressure. (Tr. 62.)

Finally, Plaintiff revealed that she has an associates degree in graphics design and drafting technology. (Tr. 65-66.)

The second and final witness at the hearing was the VE. (Tr. 64-71.) The VE testified that Plaintiff's past relevant work includes mechanical drafter (sedentary, skilled, SVP of 7). (Tr. 66.) The VE stated that Plaintiff's transferable skills are "her drafting skills." (Tr. 66.) The VE then testified that if Plaintiff had the residual functioning capacity ("RFC") to lift and/or carry ten pounds occasionally and less than ten pounds frequently and occasionally to perform postural activities such as climbing, balancing, stooping, crouching, kneeling, and crawling, she could perform less than a full range of sedentary work and she could perform her past work as a mechanical drafter. (Tr. 66-67.)

Plaintiff's attorney then examined the VE. (Tr. 67-70.) The VE testified that a person with the RFC described above would not be able to do Plaintiff's past relevant work if she had the following additional limitations: (1) the need to lie down for half an hour three to four times a day; and (2) problems with concentration. (Tr. 67-68.) She concluded that there are no hypothetical jobs in the economy that such a person could do. (Tr. 68.) The VE also testified that a person with marked inability to maintain persistence and pace due to concentration problems would not be able

to work in a drafting position or any other type of work in the national economy. (Tr. 69.)

On reexamination by the ALJ, the VE testified that a claimant that can: (1) lift and/or carry ten pounds occasionally and less than ten pounds frequently; (2) perform postural activities such as climbing, balancing, stooping, crouching, kneeling, and crawling occasionally; and (3) sit for fifteen to forty-five minutes and that has to lie down for a half hour three or four hours during the day could not perform Plaintiff's past work as a mechanical drafter. (Tr. 70.) The VE further testified that there are no jobs in the economy that such person could do with Plaintiff's same age, education, and work experience. (Tr. 70-71.)

4.      Additional Evidence

On August 3, 2007, the ALJ notified Plaintiff that he had secured additional evidence from an ME through interrogatories. (Tr. 101.) The ME gave Plaintiff a primary diagnosis of post laminectomy syndrome and a secondary diagnosis of adjustment disorder. (Tr. 106.) She testified that neither impairment meets or equals any of the impairments listed in Appendix 1. (Tr. 106.) She further testified that Plaintiff does not have to lie down three or four times during an eight-hour workday to relieve pain or discomfort. (Tr. 108.) The ME concluded that Plaintiff can: (1) lift twenty pounds occasionally and ten pounds frequently; (2) stand or walk for two hours in an eight-hour work day; (3) sit for six hours in an eight-hour work day (alternating sitting and standing every thirty to forty-five minutes); (4) never climb; and (5) occasionally balance, kneel, crouch, crawl and stoop. (Tr. 114-15.) She found that Plaintiff has a limited ability to work in atmospheres containing irritating concentrations of dust, fumes, odors, chemicals and gases, vibrations, and humidity and wetness. (Tr. 116-17.) Finally, she found Plaintiff has a limited ability to work around machinery and at unprotected heights. (Tr. 116-17.)

On November 26, 2007, the ALJ notified Plaintiff that he had secured additional evidence from the VE through interrogatories. (Tr. 88.) The VE testified that Plaintiff could perform her past relevant work as a mechanical drafter if she has the RFC to lift and/or carry ten pounds occasionally and less than ten pounds frequently, to stand and/or walk for at least two hours in an eight-hour workday, to sit for about six hours in an eight-hour workday with the need to alternate sitting and standing periodically to relieve pain or discomfort, never to climb, occasionally to balance, kneel, crouch, crawl or stoop, and never to work in atmospheres containing irritating concentrations of dusts, fumes, odors, chemical or gases, in vibration, in humidity and/or wetness, around moving machinery, or at unprotected heights. (Tr. 90-91.) She further testified that Plaintiff, with the previous RFC, could not work as a mechanical drafter or perform any job in the national economy if she had the following further limitations: (1) the need to lie down from fifteen to thirty minutes two times during an eight-hour workday; (2) an inability to attend to tasks and to concentrate due to pain, medication side effects, and depression on an occasional basis; (3) an inability to maintain pace and to meet deadlines on an occasional basis; and (4) the need for flexible hours due to pain, medication side effects and depression. (Tr. 92-93.)

### C.     ALJ's Findings

First, the ALJ found that Plaintiff met the insured status requirements for Title II disability benefits as of September 15, 2002, Plaintiffs' alleged date of disability onset, and that Plaintiff continued to meet the insured status through December 31, 2006. (Tr. 21.) Secondly, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from September 15, 2002 through December 31, 2006. (Tr. 22.) The ALJ noted that he did not consider medical evidence concerning Plaintiff's decline after March 14, 2007 because Plaintiff's date last insured was

December 31, 2006. (Tr. 25.) Third, the ALJ found that during the period from September 15, 2002 through December 31, 2006, Plaintiff had post laminectomy syndrome, bronchitis, and an adjustment disorder. (Tr. 26.) The ALJ found that Plaintiff's adjustment disorder was not a severe impairment during the period from September 15, 2002 through December 31, 2006. (Tr. 26.) He further found that Plaintiff's post laminectomy syndrome and bronchitis were severe impairments; however, those impairments are not listed in, and are not medically equal to, the listings in Appendix 1 of the regulations. (Tr. 27.) Fourth, the ALJ found Plaintiff's testimony to be generally not credible because her testimony at the hearing was "at a variance" with her statements to Dr. McLaughlin before the placement of the spinal cord stimulator and her statements to Dr. Dalal after the placement of the spinal cord stimulator. (Tr. 27.) Fifth, the ALJ found that during the relevant time period, Plaintiff "had the residual functional capacity to lift and/or carry ten pounds occasionally and less than ten pounds frequently, to stand and/or walk for at least two hours in an eight-hour workday, to sit for about six hours in an eight-hour workday with the need to alternate sitting and standing periodically to relieve pain or discomfort (i.e., to stand, walk or stretch for a minute or so every thirty to forty minutes), never to climb, occasionally to balance, kneel, crouch, crawl or stoop, and never to work in atmospheres containing irritating concentrations of dusts, fumes, odors, chemicals or gasses, in vibrations, in humidity and/or wetness, around moving machinery and at unprotected heights." (Tr. 27.) The ALJ therefore found that Plaintiff had the RFC to perform less than the full range of sedentary work during this period. (Tr. 27.) Sixth, the ALJ found that Plaintiff could have performed her past relevant work as a mechanical drafter during the relevant time period with the RFC to perform less than the full range of sedentary work. (Tr. 28.) Eighth, the ALJ found that Plaintiff was not disabled as defined by the Act during the period from

September 15, 2002 through December 31, 2006.  (Tr. 28.)

## II. ANALYSIS

### A.     Standard of Review

A claimant must prove that he is disabled for purposes of the Act to be entitled to social security benefits.  *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically- determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.     An individual who does not have a "severe impairment" will not be found to be disabled.

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.     If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability.

*Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C.A. §405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

Having reviewed the applicable legal standards, the Court now turns to the merits of the case.

### B.    Date Last Insured

Plaintiff was insured for DIB through December 31, 2006. Therefore, Plaintiff must be found to be disabled on or before December 31, 2006 in order to receive social security benefits. *See Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1995).

### C.    Issues for Review

Plaintiff contends that the ALJ erred by (1) using the wrong legal standard to evaluate the

severity of Plaintiff's mental impairment; (2) failing to evaluate Plaintiff's mental impairment using the special technique required by the regulations; (3) failing to consider all the record evidence when determining Plaintiff's RFC; and (4) failing to determine whether Plaintiff could hold a job for a significant period of time. (Pl. Br. 4-10.)

1.    Evaluation of Plaintiff's Mental Impairment

Plaintiff claims that the ALJ improperly evaluated Plaintiff's mental impairment. Specifically, Plaintiff claims that (1) although the ALJ cited the correct legal standard, he failed to apply it properly to this case and (2) the ALJ erred by not rating Plaintiff's acknowledged mental impairment using the "special technique" as required by the regulations.

The ALJ found that, although Plaintiff had a medically-determinable impairment of adjustment disorder, the impairment was "only a slight abnormality having such a minimal effect on her that it would not have expected to interfere with her ability to work." (Tr. 26.) The ALJ reasoned that Plaintiff had never received treatment by a psychiatrist or psychologist for the adjustment disorder. The ALJ further reasoned that Dr. McLaughlin's Axis V diagnosis was a current GAF of 65 to 70.

In the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). The determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id.* at 1104. The Social Security Administration has additional regulations that govern the evaluation of the severity of a claimant's mental impairment.   20 C.F.R. § 404.1520a. The regulations require the ALJ to use a "special technique" that involves identifying each mental

impairment specifically, rating the degree of functional limitation resulting from each impairment in four broad functional areas, and using those ratings to determine the severity of each impairment. *Id.* The regulations also require the ALJ to document his application of the special technique to the claimant's mental impairments. 20 C.F.R. § 404.1520a(e). Violation of a regulation constitutes reversible error and requires remand only when a reviewing court concludes that the error is not harmless. *See Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

Here, neither party disputes that Plaintiff had an acknowledged mental impairment of adjustment disorder. Defendant admits that the ALJ failed to use the special technique but contends that failure to do so was harmless error.

The ALJ's failure to adhere to the regulations prevents effective review by this Court. The record shows Plaintiff had been diagnosed and treated for depression for many years. (Tr. 56, 271, 274-76; 298; 320; 326; 334; 342; 350; 438-55; 538; 565.) However, in two sentences, the ALJ reasoned that Plaintiff's mental impairment is not severe because Plaintiff's GAF was a 65 to 70, she never saw a psychiatrist, and because she "appears to be functioning pretty well mentally." The Court can not identify the ALJ's findings regarding the degree of Plaintiff's limitations in each of the four functional areas or discern whether the ALJ properly considered all evidence relevant to those areas. Therefore, the Court cannot determine whether the ALJ's decision regarding the severity of Plaintiff's mental impairment is supported by substantial evidence and reflects application of the correct legal standard. *See Satterwhite v. Barnhart*, 44 F. App'x 652, 2002 WL 1396957, *1-2 (5th Cir. Jun. 6, 2002) (where a non-frivolous claim of mental impairment exists, the ALJ's failure to follow the psychiatric review technique and make the required findings constitutes legal error and requires remand); *Morris v. Barnhart*, No. SA-05-CA-1019-XR/NN, 2007 WL 496851, *4-5 (W.D.

16

Tex. Feb. 7, 2007); *see also Kohler v. Astrue*, 546 F.3d 260, 266-67 (2d Cir. 2008) (remand required where ALJ failed to evaluate the four functional areas and did not record specific findings in his decision); *Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005) (remand required where the ALJ's decision lacks consideration of the factors and their impact on the claimant's RFC); *Gutierrez v. Apfel*, 199 F.3d, 1048, 1051 (9th Cir. 2000) (failure to follow § 404.1520a requires remand where there is a colorable claim of mental impairment). Therefore, the case should be reversed and remanded for reconsideration of Plaintiff's mental impairment using the special technique set forth in 20 C.F.R. § 404.1520a.

      2.    <u>Remaining Issues</u>

Because the Court finds the case should be remanded for reconsideration based on the foregoing analysis, it does not reach the question of whether the ALJ erred by failing to consider all the record evidence or by failing to determine whether Plaintiff could hold a job for a significant period of time.

### III. CONCLUSION

Because this Court finds that the ALJ's failure to follow 20 C.F.R § 404.1520a when evaluating Plaintiff's mental impairment was not harmless error, the Court recommends that the decision of the Commissioner be reversed and remanded for reconsideration in line with this recommendation.

      SO RECOMMENDED, October 28, 2010.

_____

PAUL D. STICKNEY

UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within fourteen (14) days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory or general objections.  A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992).  Additionally, any  failure to file written objections to the proposed findings, conclusions and recommendation within fourteen (14) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc*).